Filed: July 2, 2004

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 03-1329
(CA-00-1582-2-12)


SOUTH CAROLINA DEPARTMENT OF HEALTH AND
ENVIRONMENTAL CONTROL; AMERISTEEL; ROANOKE
ELECTRIC STEEL CORPORATION; OWENS ELECTRIC
STEEL; NUCOR STEEL; NUCOR YAMATO; THE FEDERAL
METAL COMPANY; I. SCHUMANN & COMPANY; CP
CHEMICALS, INCORPORATED; KERR-MCGEE CHEMICAL
LLC; LUCENT TECHNOLOGIES, INCORPORATED;
MUELLER BRASS COMPANY,

Plaintiffs - Appellants,

and

GASTON COPPER RECYCLING CORPORATION,

Plaintiff,

versus


COMMERCE AND INDUSTRY INSURANCE COMPANY;
UNITED STATES FIRE INSURANCE COMPANY;
JEFFERSON INSURANCE COMPANY; THE SOUTH
CAROLINA PROPERTY AND CASUALTY INSURANCE
GUARANTY ASSOCIATION, a/k/a Mutual Fire
Marine and Inland Insurance Company,

Defendants - Appellees.

-------------------------

COMPLEX INSURANCE CLAIMS LITIGATION ASSOCIATION,

Amicus Supporting Appellees.

O R D E R

The Court amends its opinion filed June 8, 2004, as follows:

On page 15, first line of text, the word "breath" is corrected to read "breadth."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

SOUTH CAROLINA DEPARTMENT OF
HEALTH AND ENVIRONMENTAL
CONTROL; AMERISTEEL; ROANOKE
ELECTRIC STEEL CORPORATION; OWENS
ELECTRIC STEEL; NUCOR STEEL;
NUCOR YAMATO; THE FEDERAL
METAL COMPANY; I. SCHUMANN &
COMPANY; CP CHEMICALS,
INCORPORATED; KERR-MCGEE
CHEMICAL LLC; LUCENT
TECHNOLOGIES, INCORPORATED;
MUELLER BRASS COMPANY,
              *Plaintiffs-Appellants,*

                and

GASTON COPPER RECYCLING
CORPORATION,
                          *Plaintiff,*          No. 03-1329

                v.

COMMERCE AND INDUSTRY INSURANCE
COMPANY; UNITED STATES FIRE
INSURANCE COMPANY; JEFFERSON
INSURANCE COMPANY; THE SOUTH
CAROLINA PROPERTY AND CASUALTY
INSURANCE GUARANTY ASSOCIATION,
a/k/a Mutual Fire Marine and Inland
Insurance Company,
              *Defendants-Appellees.*

COMPLEX INSURANCE CLAIMS
LITIGATION ASSOCIATION,
        *Amicus Supporting Appellees.*

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
C. Weston Houck, District Judge.
(CA-00-1582-2-12)

Argued: December 3, 2003

Decided: June 8, 2004

Before WIDENER and KING, Circuit Judges, and
Richard D. BENNETT, United States District Judge
for the District of Maryland, sitting by designation.

---

Affirmed by published opinion. Judge King wrote the opinion, in
which Judge Widener and Judge Bennett joined.

---

## COUNSEL

**ARGUED:** David Oscar Ledbetter, HUNTON & WILLIAMS, Rich-
mond, Virginia, for Appellants. Brian Christopher Coffey, COHN &
BAUGHMAN, Chicago, Illinois, for Appellees. **ON BRIEF:** Andrea
W. Wortzel, HUNTON & WILLIAMS, Richmond, Virginia; Law-
rence J. Bracken, II, HUNTON & WILLIAMS, Atlanta, Georgia;
James L. Werner, ELLZEY & BROOKS, L.L.C., Columbia, South
Carolina; Claron A. Robertson, III, ROBERTSON & HOLLINGS-
WORTH, Charleston, South Carolina; Jacquelyn S. Dickman, Office
of General Counsel, DEPARTMENT OF HEALTH & ENVIRON-
MENTAL CONTROL, Columbia, South Carolina, for Appellants.
Michael J. Baughman, COHN & BAUGHMAN, Chicago, Illinois; R.
David Howser, Andrew E. Haselden, HOWSER, NEWMAN & BES-
LEY, L.L.C., Columbia, South Carolina; Timothy A. Domin, CLAW-
SON & STAUBES, L.L.C., Charleston, South Carolina; Richard S.
Kuhl, Ngoc H. Lam, JACKSON & CAMPBELL, P.C., Washington,
D.C.; Charles J. Baker, Davis S. Yandle, BUIST, MOORE, SMYTHE
& MCGEE, Charleston, South Carolina, for Appellees. Laura A. Fog-
gan, Gary P. Seligman, WILEY, REIN & FIELDING, L.L.P., Wash-
ington, D.C., for Amicus Curiae.

**OPINION**

KING, Circuit Judge:

The appellants, consisting of South Carolina's Department of Health and Environmental Control, Kerr-McGee Chemical LLC, and certain businesses involved in the manufacture and transportation of fertilizer production materials, seek reinstatement of their civil action against four liability insurers for cost recovery, contribution, restitution, and declaratory relief. By its Judgment Order of February 14, 2003, the district court for South Carolina dismissed the lawsuit's two direct action claims against the insurers, one seeking cost recovery and one seeking contribution, for failure to state claims upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). The court also dismissed the appellants' common law claim for restitution, and it declined to exercise jurisdiction over two declaratory judgment claims. *S.C. Dep't of Health & Envtl. Control v. Commerce & Indus. Ins. Co.*, No. 2:00-1582-12 (D.S.C. Feb. 14, 2003).

This appeal concerns the application and interplay of two major federal environmental protection statutes. The first is the Resource Conservation and Recovery Act ("RCRA"), which authorizes the pursuit of civil actions directly against insurers[1] who have provided RCRA-mandated evidence of financial responsibility to owners and operators of RCRA-regulated hazardous waste facilities. 42 U.S.C. § 6901 *et seq.* The second is the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA," commonly known as "Superfund"), which in proper circumstances authorizes the pursuit of claims for cost recovery and contribution against parties potentially responsible for contaminating CERCLA-regulated facilities. 42 U.S.C. § 9601 *et seq.* In their complaint, the appellants rely on the direct action provision of RCRA (42 U.S.C. § 6924(t)(2)) to seek cost recovery and contribution under CERCLA. The primary issue in this appeal is whether RCRA's direct action provision may

---

[1]A direct action is simply a lawsuit directly against an insurer rather than indirectly through an insured tortfeasor. *Black's Law Dictionary* 371 (abridged 7th ed. 2000); *see also Searles v. Cincinnati Ins. Co.*, 998 F.2d 728, 730 (9th Cir. 1993) (observing that, in direct action, plaintiff is entitled to bring suit directly against tortfeasor's liability insurer).

be utilized to pursue these CERCLA claims. The appellants contend that it can be so utilized and that the district court, in dismissing their complaint, misconstrued the RCRA direct action provision. As explained below, we affirm.

I.

A.   <em>The Resource Conservation and Recovery Act</em>

RCRA was enacted in October 1976, and it is codified as Chapter 82 (entitled "Solid Waste Disposal") of Title 42 of the United States Code. RCRA mandates the Environmental Protection Agency (the "EPA") to develop permitting requirements for hazardous waste facilities.[2] RCRA § 3004(a)(6); 42 U.S.C. § 6924(a)(6). One of those requirements is that, in seeking a permit, an owner or operator of such a hazardous waste facility must provide financial assurance to the EPA for liability relating to closure, postclosure, or corrective activities at the facility.[3] 40 C.F.R. § 264.140 *et seq.* (establishing standards regarding applicability of financial requirements for owners and operators of hazardous waste facilities); 40 C.F.R. § 265.140 *et seq.* (establishing interim status standards regarding applicability of financial requirements for owners and operators of hazardous waste facilities). In demonstrating to the EPA that they possess RCRA-mandated

---

[2]RCRA requires that a permit be obtained for the treatment, storage, or disposal of any "hazardous waste" identified or listed in 40 C.F.R. Part 261. 40 C.F.R. § 270.1(c). A hazardous waste facility consists of "all contiguous land, and structures, other appurtenances, and improvements on the land, used for treating, storing, or disposing of hazardous waste." 40 C.F.R. § 260.10.

[3]"Closure" is "[t]he procedure that a solid or hazardous waste management facility undergoes to cease operations and ensure protection of human health and the environment in the future." EPA, *RCRA Orientation Manual* 137 (Jan. 2003), *available at* http://www.epa.gov/epaoswer/general/orientat (the "Orientation Manual"). "Postclosure" is the period after closure "during which owners and operators of solid or hazardous waste disposal units conduct monitoring and maintenance activities in order to preserve the integrity of the disposal system." *Id.* Finally, a "corrective action" is a "program to address the investigation and cleanup of contamination from solid waste facilities, hazardous waste facilities, and [underground storage tanks]." *Id.*

financial responsibility for the closure and postclosure care of such facilities (40 C.F.R. §§ 264.143, 264.144), such owners and operators are obliged to provide for the compensation of third parties for certain injuries or damages resulting from spills and accidental occurrences. *Id.* § 264.147. The financial responsibility mandate is designated in the regulations as "financial assurance," *id.* §§ 264.143, 264.145, 264.147, and, according to RCRA, it may be established "by any one, or any combination, of the following: insurance, guarantee, surety bond, letter of credit, or qualification as a self-insurer." 42 U.S.C. § 6924(t)(1).

In November 1984, the scope and requirements of RCRA (Chapter 82 of Title 42) were amended by the Hazardous and Solid Waste Amendments, and a right of direct action was included in RCRA. *See* 42 U.S.C. §§ 6991-6991i. Pursuant to RCRA's direct action provision (the "RCRA Provision"):

> In any case where the owner or operator is in bankruptcy . . . , any claim arising from conduct for which evidence of financial responsibility must be provided under [42 U.S.C. § 6924 (RCRA's financial responsibility provision)] may be asserted directly against the guarantor providing such evidence of financial responsibility.

RCRA § 3004(t)(2); 42 U.S.C. § 6924(t)(2).[4]

### B. *The Comprehensive Environmental Response, Compensation, and Liability Act*

CERCLA was enacted in December 1980, and it is codified as Chapter 103 (entitled "Comprehensive Environmental Response, Compensation, and Liability") of Title 42. 42 U.S.C. § 9601 *et seq.* CERCLA was a congressional response to public concern over the

---

[4]Under RCRA, a "guarantor" is "any person, other than the owner or operator, who provides evidence of financial responsibility for an owner or operator [of a hazardous waste facility] under [42 U.S.C. § 6924]." *Id.* § 6924(t)(4). And evidence of financial responsibility, as required under 42 U.S.C. § 6924, may be established by insurance coverage. *Id.* § 6924(t)(1).

improper disposal of hazardous waste, and its two primary goals have been recognized as (1) the promotion of prompt and effective cleanup of hazardous waste sites, and (2) the sharing of financial responsibility among those "parties who created the hazards." *Aviall Servs., Inc. v. Cooper Indus., Inc.*, 312 F.3d 677, 681 (5th Cir. 2002). In order to attain these goals, CERCLA "generally imposes strict liability on owners and operators of facilities" from which hazardous substances were released, and it authorizes civil actions against certain statutorily-defined "responsible parties" to recover the costs incurred in cleaning up hazardous waste disposal sites. *3550 Stevens Creek Assocs. v. Barclays Bank*, 915 F.2d 1355, 1357 (9th Cir. 1990). Significantly, any party incurring response costs consistent with the statutorily-mandated and EPA-created National Contingency Plan ("NCP")[5] is authorized to seek recovery of those costs from other potentially responsible parties by way of a CERCLA cost-recovery claim. 42 U.S.C. § 9607(a).

A cost-recovery claim may be asserted under section 107 of CERCLA by a government or private entity seeking to recover from a responsible party any response costs incurred in remediating a hazardous waste facility. R.M. Hall, Jr., *et al.*, *Superfund Manual: Legal and Management Strategies* 4-13 (3d ed., Gov't Insts., Inc., 1988). Under CERCLA, the term "potentially responsible party" ("PRP") is deemed by the EPA to be "[t]he person or persons who may be held liable for hazardous substance contamination under CERCLA. PRPs may include the owners and operators, generators, transporters, and disposers of the hazardous substances." Orientation Manual, app. D. In October 1986, CERCLA was amended by the Superfund Amendments and Reauthorization Act, which was also codified in Chapter 103 of Title 42. As a result, Chapter 103 now expressly authorizes a CERCLA cause of action for contribution. 42 U.S.C. § 9613(f). Pursuant thereto, any party incurring response costs consistent with the NCP may seek its cleanup costs from other PRPs by way of a CERCLA contribution claim. *Id.*

---

[5]The NCP, codified at 40 C.F.R. Part 300, constitutes the EPA's implementation of the CERCLA response process and provides information about the roles and responsibilities of the EPA, the various states, and private parties regarding the release of hazardous substances and the remediation of areas impacted by such a release.

Furthermore, CERCLA (Chapter 103 of Title 42), like RCRA (Chapter 82 of Title 42), contains a direct action provision. The CERCLA direct action provision authorizes a party to assert any claim authorized by § 9607 or § 9611 "directly against any guarantor providing evidence of financial responsibility" under CERCLA.[6] 42 U.S.C. § 9608(c)(2). Although the EPA has promulgated regulations giving effect to the RCRA Provision by establishing financial responsibility requirements thereunder, *see* 40 C.F.R. § 264.140 *et seq.* (establishing RCRA's financial responsibility requirements), no financial responsibility regulations have been promulgated by the EPA to implement the CERCLA direct action provision with respect to "onshore" CERCLA facilities (such as the facility at issue here). CERCLA required the promulgation of regulations establishing minimum levels of financial responsibility for the operation of hazardous waste facilities under CERCLA. 42 U.S.C. § 9608(b)(1). Although the executive was mandated to promulgate those regulations "not earlier than five years after December 11, 1980," *id.*, no such regulations have been promulgated.

## C.  *Factual Background*

From 1978 to 1992, Stoller Chemical Company operated a fertilizer manufacturing facility (the "Facility") in Jericho, South Carolina. Pursuant to RCRA subsection 3006(b), the EPA may authorize a state to administer and enforce its own hazardous waste program, so long as the state program is equivalent to and consistent with the EPA's

---

[6]Pursuant to CERCLA's direct action provision:

> In the case of a release or threatened release from a facility, any claim authorized by section 9607 or 9611 of this title may be asserted directly against any guarantor providing evidence of financial responsibility under subsection (b) of this section, if the person liable under section 9607 of this title is in bankruptcy
> . . . .

42 U.S.C. § 9608(c)(2). Under CERCLA, a "guarantor" is "any person, other than the owner or operator, who provides evidence of financial responsibility for an owner or operator *under this chapter*." *Id.* § 9601(13) (emphasis added). Thus, CERCLA's direct action provision can only be used if financial responsibility was required and provided under Chapter 103 of Title 42.

program. 42 U.S.C. § 6926(b). In November 1985, South Carolina became an EPA-authorized state and assumed primary responsibility, i.e., "primacy," for implementing its hazardous waste program. Although the state's hazardous waste regulations applied to the Facility, the EPA retained its full enforcement authority under RCRA in South Carolina. *See Fla. Power & Light Co. v. EPA*, 145 F.3d 1414, 1416-17 (D.C. Cir. 1998) (discussing cooperative federalism and state authorization under RCRA). Both the EPA and the Department of Health and Environmental Control ("DHEC") classified the Facility, pursuant to RCRA and the South Carolina Hazardous Waste Management Act, as a hazardous waste treatment, storage, and disposal facility. Because of this classification, the Facility's operations were regulated under both federal and state law.

In the early 1980s, Stoller was granted several operating permits by DHEC under which it was authorized to operate the Facility as a RCRA-regulated hazardous waste facility. In order to secure these permits, Stoller provided to DHEC the RCRA-mandated financial assurance that it could protect third parties from damages or injuries caused by operation of the Facility. 42 U.S.C. § 6924(t)(2); S.C. Code § 44-56-60(c). In their amended complaint (the "Complaint"),[7] the appellants allege, inter alia, that the defendant insurers (the "Insurers") had filed RCRA-mandated Certificates of Liability Insurance with DHEC, certifying that they provided insurance coverage to Stoller satisfying RCRA's financial assurance requirements.[8] Complaint ¶¶ 48-58. The Complaint also alleges that the policies cover the costs incurred by DHEC and the other appellants, as "required by Federal and South Carolina law," Complaint ¶ 12; that the claims arise from

---

[7]The appellants' initial complaint was filed on April 4, 2000. Their amended complaint was filed on December 23, 2002, and constitutes the operative complaint for purposes of this appeal. *S.C. Dep't of Health & Envtl. Control v. Commerce & Indus. Ins. Co.*, No. 2:00-1582-18, ¶¶ 48-58 (D.S.C. Dec. 23, 2002).

[8]The four Insurers are: Commerce and Industry Insurance Company, United States Fire Insurance Company, Jefferson Insurance Company, and the South Carolina Property and Casualty Insurance Guaranty Association (the fiduciary for Planet Insurance Company, a division of Reliance Insurance Company, which entered into liquidation in October 2001).

conduct for which RCRA-mandated insurance was obtained from the Insurers, Complaint ¶ 21; and that the policies satisfy the applicable South Carolina law and regulations, "which implement[ ] the requirements of RCRA and its regulations." Complaint ¶ 48. Additionally, the appellants admit that the Insurers did not provide insurance coverage to Stoller pursuant to CERCLA's financial assurance requirements. *See* Appellants' Reply Br. at 11 (*acknowledging* CERCLA's financial assurance provision not applicable to Facility).

In March 1992, Stoller ceased operations at the Facility and filed for Chapter 7 bankruptcy protection in Texas. Shortly thereafter, the EPA investigated the Facility and determined that its real property was contaminated. Because Stoller had filed for bankruptcy and was insolvent, the EPA and DHEC initiated CERCLA enforcement proceedings in the District of South Carolina against Kerr-McGee, which owned the Facility from 1962 to 1978, and against certain of the appellants who had been involved in the manufacture and transportation of fertilizer production materials used at the Facility (the "Corporate Claimants").[9] In those CERCLA enforcement proceedings, the EPA and DHEC sought remediation — that is, the environmental cleanup — of the Facility.[10] Complaint ¶ 6.

In 1994, as a result of these enforcement proceedings, the Corporate Claimants, the EPA, and DHEC entered into a comprehensive settlement agreement, by which they resolved each PRP's CERCLA liability for costs associated with remediating the Facility. By Order of June 13, 2002, the district court approved the settlement agreement. *S.C. Dept. of Health & Envtl. Control v. Atl. Steel Indus., Inc.*, No. 2:97-726-12 (D.S.C. June 13, 2002). Pursuant thereto, the Corpo-

---

[9]The Corporate Claimants are: Ameristeel Corporation; CP Chemicals, Inc.; I. Schumann & Company; Kerr-McGee Chemical LLC; Lucent Technologies Inc.; Mueller Brass Company; Nucor Corporation; Nucor-Yamato Steel Company Inc.; Roanoke Electric Steel Corporation; Owen Electric Steel Company of South Carolina, Inc.; and The Federal Metal Company.

[10]A "remedial action" under CERCLA is an activity consistent with permanently remedying the release of hazardous substances into the environment so as to prevent danger to the public health or the environment. *See* 42 U.S.C. § 9601(24).

rate Claimants are in the process of remediating the Facility, and they have agreed to complete it. The Corporate Claimants have also agreed to reimburse DHEC for its remediation expenses and for all costs associated with its administration of the remediation process. Complaint ¶ 8.

## D.  *Procedural History*

By their Complaint, the appellants seek to recover from the Insurers their past remediation costs and the costs they have agreed to pay for future remediation of the Facility. Complaint ¶ 20. In Count One, the appellants seek to recover their remediation costs directly from the Insurers, pursuant to section 107 of CERCLA. 42 U.S.C. § 9607. Count Two, initiated on behalf of the Corporate Claimants only, seeks contribution directly from the Insurers, pursuant to section 113 of CERCLA. *Id.* § 9613. In Count Three, the appellants seek common law restitution directly from the Insurers. In Count Four, the Corporate Claimants seek a declaration that each Insurer is obliged to pay for all future damages, losses, and costs incurred in remediating the Facility. Finally, in Count Five, DHEC seeks a declaration that the Insurers must pay all future costs resulting from the Facility's remediation.

On January 10, 2003, the Insurers moved to dismiss the Complaint. With respect to Counts One and Two, they maintained that the appellants could not proceed directly against them to recover costs already expended in remediating the Facility because:

    (1)   the appellants' claims for the recovery of remediation costs arise under CERCLA, rather than RCRA;

    (2)   RCRA and CERCLA contain separate and distinct direct action provisions;

    (3)   in order to initiate a *CERCLA* cause of action directly against an insurer, a claimant must rely on *CERCLA's* direct action provision, rather than on the RCRA Provision;

    (4)   CERCLA's direct action provision authorizes suit directly against an insurer to recover cleanup costs *only* if

the insurer provided evidence of financial responsibility *pursuant to CERCLA*; and

(5) the Insurers provided financial assurance to Stoller *pursuant to RCRA, not CERCLA*.

In sum, the Insurers maintained that Counts One and Two failed to state claims upon which relief can be granted, *see* Fed. R. Civ. P. 12(b)(6), because the RCRA Provision cannot be utilized to pursue a remedy under CERCLA. The court agreed with the Insurers and dismissed those claims, ruling that the RCRA provision may not be used to pursue a CERCLA claim against insurers of hazardous waste facilities.

In seeking the dismissal of Count Three, the Insurers contended that it was a CERCLA claim mischaracterized as a claim for common law restitution. They maintained that Count Three is indistinguishable from the claims asserted in Counts One and Two and that it was subject to dismissal on the same basis. The Insurers also contended that Count Three was defective because, under South Carolina law, a direct action may not be pursued on a restitution claim. The court agreed with the Insurers, deciding that Count Three is a CERCLA claim in disguise and that South Carolina law does not authorize a restitution claim to be asserted directly against an insurer.

Finally, the court declined to exercise jurisdiction over Counts Four and Five. First, it determined that it could not resolve the declaratory judgment claims without declaring Stoller's rights under the policies. And it concluded that, because Stoller was not a party to the proceedings, the court could not declare those rights. Second, the court decided that interests of judicial economy required it to decline jurisdiction over the declaratory judgment claims. On February 14, 2003, it entered an order dismissing the Complaint.[11] *S.C. Dep't of Health*

---

[11]In their briefs in this appeal, the parties assert that the Complaint was dismissed "with prejudice." The court's February 14, 2003, Judgment Order, however, simply provides that the plaintiffs' action "is hereby dismissed." The court based the dismissal of Counts Four and Five on its decision not to exercise jurisdiction over those claims. In so ruling, the court did not pass on the merits of those counts. The district court's dismissal of Counts Four and Five was thus *without prejudice*. *See, e.g.*, *Greening v. Moran*, 953 F.2d 301, 304 (7th Cir. 1992).

*& Envtl. Control v. Commerce & Indus. Ins. Comp.*, No. 2:00-1582-12 (D.S.C. Feb. 14, 2003). The appellants have timely appealed, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review de novo the dismissal of a complaint for failure to state a claim, viewing the complaint in the light most favorable to the plaintiff and accepting as true all well-pleaded allegations. *Franks v. Ross*, 313 F.3d 184, 192 (4th Cir. 2002). We review for abuse of discretion a district court's decision not to rule on a claim for declaratory relief, and we afford the court "great latitude" in determining whether to exercise jurisdiction in such matters. *Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.*, 139 F.3d 419, 421-23 (4th Cir. 1998).

## III.

### A.

In Counts One and Two, the appellants assert CERCLA cost-recovery and contribution claims directly against the Insurers. 42 U.S.C. § 9607 (cost recovery); *id.* § 9613 (contribution). On appeal, they maintain that the district court erred in concluding that they could not meld the procedural direct action right authorized by RCRA, *id.* § 6924(t)(2), with substantive rights of recovery authorized under CERCLA. The appellants contend that nothing in the RCRA Provision precludes their pursuing CERCLA claims, on the basis of the RCRA Provision, directly against the Insurers. The appellants also maintain that the national policy underlying the adoption of RCRA supports their use of the RCRA Provision. We reject these contentions for the following reasons: first, by its plain language, the RCRA Provision applies only to claims concerning present and future threats to human health and the environment; second, the appellants' reliance on the RCRA Provision is an effort to circumvent CERCLA's more specific direct action provision; and third, the national policy underlying RCRA indicates that Congress intended to limit the RCRA Provision to claims concerning present and future threats to human health and the environment. We discuss in turn each of these bases for our conclusion.

1.

First, the plain language of the RCRA Provision convinces us that it applies only to claims concerning present and future threats to human health and the environment, as opposed to claims seeking to recover the costs of environmental cleanup activities. In resolving issues of statutory construction, we are obliged to begin with the language of a statute. If the statute is clear, "judicial inquiry into the statute's meaning, in all but the most extraordinary circumstances, is finished." *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475 (1992). We decide whether statutory language is plain by assessing "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). As explained below, the RCRA Provision, viewed in its broader context, precludes its being used to pursue Counts One and Two.

a.

In order to evaluate the RCRA Provision in its broader context, we must understand the distinct goals of RCRA and CERCLA. Although the aims of RCRA and CERCLA are related, each serves a separate and unique purpose.[12] *Westfarm Assocs. Ltd. P'ship v. Wash. Suburban Sanitary Comm'n*, 66 F.3d 669, 679 (4th Cir. 1995) ("'RCRA is preventative; CERCLA is curative.'" (quoting *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1202 (2d Cir. 1992))). According to Congress, RCRA "established this nation's basic hazardous waste management system . . . , and provided complementary authority to encourage the conservation and recovery of valuable materials and energy." H.R. Rep. No. 98-198, pt. 1, at 19 (1984), *reprinted in* 1984 U.S.C.C.A.N. 5576, 5577. As a result, RCRA is preventative in nature — "[i]t attempts to deal with hazardous waste before it becomes a problem by establishing minimum federal standards for the generation, treatment, storage, transportation, and disposal of hazard-

---

[12]According to the EPA, "CERCLA is designed to remedy the mistakes in hazardous waste management made in the past, while the RCRA waste management standards are concerned with avoiding such mistakes through proper management in the present and future." Orientation Manual VI-9.

ous waste, and the permitting of facilities to treat hazardous waste." *Envtl. Tech. Council v. Sierra Club*, 98 F.3d 774, 779 (4th Cir. 1996). Indeed, as the Supreme Court has observed, RCRA is *not* principally designed to "compensate those who have attended to the remediation of environmental hazards." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996).

CERCLA, on the other hand, serves goals that are remedial and curative rather than preventative. *Westfarm Assocs.*, 66 F.3d at 679. As we have observed, "CERCLA establishes a cleanup program for hazardous waste which has already been disposed of improperly." *Envtl. Tech. Council*, 98 F.3d at 779. Although RCRA serves CER-CLA's remedial purpose by preventing the creation of future Super-fund sites, *see* H.R. Rep. No. 98-198, pt. 1, at 20 (1984), *reprinted in* 1984 U.S.C.C.A.N. 5576, 5579 (observing that "in the absence of [enforcement of RCRA], little more will be done than to contribute to future burdens on the 'Superfund' program, which is the remedial program charged to EPA under [CERCLA]"), RCRA does not authorize the prosecution of civil actions seeking the recovery of cleanup costs. *Meghrig*, 516 U.S. at 483. We recognize that both RCRA and CERCLA address issues relating to the management of hazardous wastes. Each statute serves discrete and unique purposes, however, and we are constrained to assess the RCRA Provision within this broader context.

b.

Rather than analyzing the RCRA Provision in its broader context, the appellants inappropriately focus on the term "any claim," as contained therein. Relying on this term, they maintain that nothing in the RCRA Provision restricts its use to claims arising under RCRA. In so contending, however, they misapprehend the context in which the term "any claim" is used. Read in context, the term "any claim" refers to any claim *arising from conduct for which the insurer provided evidence of financial responsibility*. 42 U.S.C. § 6924(t)(2) (providing that "any claim arising from conduct for which evidence of financial responsibility must be provided under this section may be asserted directly against the guarantor providing such evidence of financial responsibility").

The breadth of the RCRA Provision necessarily relates to the extent to which insurance coverage is mandated by RCRA's financial responsibility requirement. Under the appellants' interpretation of the RCRA Provision, an injured party could pursue any claim arising from the operation of a RCRA-regulated facility directly against an insurer providing RCRA-mandated coverage to the facility. If this position were valid, then Congress has also authorized the RCRA Provision to be used, inter alia, to pursue negligence claims arising from auto accidents resulting from the operation of such facilities. And because such direct-action negligence claims would be maintained under RCRA, they could be pursued in federal court. *See* 28 U.S.C. § 1331. There is nothing in the text of RCRA, however, or in its legislative history, indicating that Congress intended such an absurd result. In these circumstances, we can only conclude that the RCRA Provision authorizes a direct action against an insurer only to the extent that the insurer was required by RCRA to provide financial assurance.

As to Counts One and Two, therefore, we must assess whether those claims arise from conduct for which the Insurers were required, pursuant to RCRA, to provide evidence of financial responsibility. In RCRA, Congress mandated the EPA to promulgate regulations requiring owners and operators of hazardous waste facilities to provide evidence of their financial responsibility (i.e., provide financial assurance). 42 U.S.C. § 6924(a)(6). Because the EPA has granted primacy to South Carolina with respect to its RCRA hazardous waste management program, the RCRA-regulated hazardous waste facilities in that state must comply with *South Carolina's* financial responsibility provision (the "S.C. Provision"). South Carolina: Decision on Final Authorization of State Hazardous Waste Management Program, 50 Fed. Reg. 46,437 (Nov. 8, 1985). Therefore, we must decide whether the insurance coverage required by the S.C. Provision included Stoller's conduct giving rise to the claims asserted in Counts One and Two. Two parts of the S.C. Provision define the ambit of the financial assurance required for an owner or operator to obtain a RCRA permit from DHEC. First, subsection (c)(2) provides that DHEC may not issue a permit to an owner or operator of a hazardous waste facility unless such owner or operator has provided DHEC with:

[e]vidence of financial assurance in the form and amount as [DHEC] may determine to be necessary to ensure that, upon abandonment, cessation, or interruption of the operation of a facility or site, all appropriate measures are taken to *prevent present and future damage* to the public health and safety and to the environment.

S.C. Code § 44-56-60(c)(2) (emphasis added). Thus, the coverage mandated by this part of the S.C. Provision is expressly limited to claims for "present and future" damage to public health, safety, and the environment.

A separate subsection of the S.C. Provision requires that, before issuing a permit to an owner or operator of a hazardous waste facility, DHEC shall require "[e]vidence of other financial assurance in such forms and amounts as [DHEC] determines to be necessary to ensure the adequate availability of funds for clean-up costs and restoration of environmental impairment arising from the facility." S.C. Code § 44-56-60(c)(3). Although the scope of coverage required by this part of the S.C. Provision is not *expressly* limited to present and future damage, the scope of such coverage is identical to that mandated by the federal requirements. South Carolina: Final Authorization of State Hazardous Waste Management Program Revision, 68 Fed. Reg. 52,126 (Sept. 2, 2003) (observing that South Carolina's RCRA-authorized hazardous waste program has no requirements more stringent or broader in scope than those required by federal law). The insurance coverage mandated by the S.C. Provision is therefore restricted to present and future threats to human health and the environment —— insurance coverage for cost-recovery and contribution is not mandated by the S.C. Provision. *See supra* Part III.A.1.a.; *infra* Part III.A.3.

In this dispute, Counts One and Two seek reimbursement for costs the appellants incurred in remediating past environmental harms; i.e., cleaning up the Facility. *See* Complaint ¶¶ 18-19, 64, 69 (alleging that appellants are entitled to reimbursement for costs they incurred in addressing environmental contamination at Facility). The S.C. Provision, however, requires financial assurance only to ensure that "all appropriate measures are taken to prevent *present* and *future* damage to the public health and safety and to the environment." S.C. Code

§ 44-56-60(a)(2) (emphasis added). Thus, on the basis of the RCRA Provision, analyzed in concert with the S.C. Provision, the district court properly ruled that Counts One and Two fail to satisfy Rule 12(b)(6). The appellants are thus unable to rely on the RCRA Provision to pursue their CERCLA cost-recovery and contribution claims directly against the Insurers.

2.

In seeking to use the RCRA Provision to assert their CERCLA claims directly against the Insurers, the appellants are undertaking to circumvent CERCLA's direct action provision.[13] Pursuant to elementary principles of statutory construction, unless the legislature has indicated that it intends otherwise, a specific statutory provision controls a more general one. *See Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 375 (1990) ("It is an elementary tenet of statutory construction that '[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one . . . .'" (quoting *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974))); *see also Warren v. N.C. Dep't of Human Res.*, 65 F.3d 385, 390 (4th Cir. 1995) ("It is an elementary principle of statutory construction that a specific statutory provision controls a more general one."). Importantly, the CERCLA provision limits the circumstances under which it may be used to assert CERCLA claims directly against a liable party's insurer.

On appeal, the appellants acknowledge that the limitations of CERCLA's direct action provision preclude its use with respect to their CERCLA claims.[14] The appellants' effort to use the more general

---

[13]RCRA and CERCLA constitute separate Chapters in Title 42, and they contain separate provisions and requirements. The appellants, however, seek to maintain direct actions against the insurers using a procedure from Chapter 82 (RCRA) to seek remedies provided for under Chapter 103 (CERCLA).

[14]The appellants are unable to rely on CERCLA's direct action provision because that provision may only be used to assert claims against guarantors providing evidence of financial responsibility pursuant to CERCLA, 42 U.S.C. § 9608(c)(2), and as the appellants acknowledge, the Insurers are RCRA — not CERCLA — guarantors.

RCRA Provision to assert their CERCLA claims directly against the Insurers must fail because nothing in the statutes or legislative history of either CERCLA or RCRA indicates that Congress intended to authorize a party to rely on the RCRA Provision to the exclusion of the more specific statutory requirements of CERCLA. The district court therefore correctly concluded that the appellants must rely on the narrowly-tailored provision of CERCLA, rather than on the more general RCRA Provision, to assert their CERCLA claims directly against the Insurers.

3.

Finally, the appellants maintain that the national policy underlying the enactment of RCRA supports their use of the RCRA Provision in pursuing Counts One and Two directly against the Insurers. On the contrary, however, the national policy underlying RCRA's enactment supports the district court's *dismissal* of Counts One and Two. In enacting RCRA, Congress declared that:

> the generation of hazardous waste is to be reduced or eliminated as expeditiously as possible. Waste that is nevertheless generated should be treated, stored, or disposed of so as to minimize the *present* and *future* threat to human health and the environment.

42 U.S.C. § 6902 (setting forth policy under RCRA in provision titled "National Policy") (emphasis added). The Eighth Circuit, relying in part on the national policy underlying RCRA, concluded that "RCRA's goal is to prevent the creation of hazardous waste sites, rather than to promote the cleanup of existing sites." *Furrer v. Brown*, 62 F.3d 1092, 1098 (8th Cir. 1995). Significantly, the Supreme Court has observed that RCRA was principally designed to "reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the *present* and *future* threat to human health and the environment,'" rather than "to compensate those who have attended to the remediation of environmental hazards." *Meghrig*, 516 U.S. at 483 (quoting 42 U.S.C. § 6902(b)) (emphasis added). The national policy underlying RCRA's enactment, as well as the court decisions relating thereto, indicate that RCRA-mandated insurance provides

coverage for occurrences arising from *present harm* and *prospective threats* to public health and the environment, rather than for cost-recovery or contribution claims springing from *past* cleanup efforts. 42 U.S.C. § 6902; *Meghrig*, 516 U.S. at 483; *Furrer*, 62 F.3d at 1098.

B.

The appellants next contend that Count Three, the South Carolina common law restitution claim, was also improperly dismissed. Although recognizing that South Carolina authorizes a cause of action for restitution, *see, e.g.*, *Player v. Chandler*, 382 S.E.2d 891 (S.C. 1989), the appellants' analysis fails to distinguish a "typical" common law restitution claim from a restitution effort pursued directly against an insurer. A direct action against an insurer cannot be maintained under South Carolina law unless one of two criteria is satisfied: (1) privity of contract between the claimant and the insurer; or (2) an express statutory grant of the right to restitution. *Major v. Nat'l Indem. Co.*, 229 S.E.2d 849, 850 (S.C. 1976); *see also Swinton v. Chubb & Son, Inc.*, 320 S.E.2d 495, 496 (S.C. 1984) (rejecting direct action against insurer because no express grant of right to restitution by legislature). Here, the Complaint does not allege privity between the appellants and the Insurers, nor has the South Carolina legislature provided statutory authorization for a direct action. Even if we assumed that, because of South Carolina's primacy status, the RCRA provision may provide the basis for a restitution claim, the dismissal of Count Three would be appropriate because the national policy underlying RCRA suggests that it was not intended for use by parties seeking compensation for *past cleanup* of environmental contamination. *See supra* Part III.A.3. Because the RCRA Provision does not authorize cost recovery or compensation for past cleanup costs, a cause of action for restitution cannot be maintained directly against the Insurers. Thus, the district court's dismissal of Count Three, pursuant to Rule 12(b)(6), was also proper.

C.

Turning finally to Counts Four and Five, the appellants seek a judicial declaration that each Insurer is obliged to pay for all damages, losses, and costs the appellants may incur with respect to future environmental remediation at the Facility. The district court concluded

that it was appropriate, for two reasons, to dismiss those two claims. First, because Stoller was not a party, the court reasoned that any rights stemming from Stoller's insurance policies may be indeterminable. Second, the court expressed concern over the piecemeal nature of the litigation and the potential adverse impact retaining jurisdiction over Counts Four and Five could have on judicial economy. The appellants maintain that the dismissal of Counts Four and Five on these two bases was an abuse of discretion because: (1) CERCLA expressly provides for declaratory relief concerning cost-recovery claims; (2) courts have repeatedly confirmed the availability of declaratory relief to CERCLA contribution plaintiffs; and (3) nothing in the RCRA Provision precludes its use in pursuing declaratory judgment relief under CERCLA for *present* or *prospective* harm.

A district court possesses broad discretion on whether to exercise its jurisdiction in declaratory judgment proceedings, and we are obliged to accord deference to the exercise of such discretion.[15] *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937). As we have consistently observed, the decision to grant or deny a petition for declaratory relief "is a matter resting in the sound discretion of the trial court." *Id.*; *Doby v. Brown*, 232 F.2d 504, 506 (4th Cir. 1956); *Am. Fid. & Cas. Co. v. Serv. Oil Co.*, 164 F.2d 478, 481 (4th Cir. 1947). Although a trial court has great latitude in determining whether to assert jurisdiction over declaratory judgment actions, we have nonetheless enumerated certain factors, including judicial efficiency, to be utilized in the exercise of such discretion. *See Ind-Com Elec. Co.*, 139 F.3d at 422 (enumerating several factors to guide court's exercise of discretionary jurisdiction over declaratory judgments); *Mitcheson v. Harris*, 955 F.2d 235, 237-40 (4th Cir. 1992) (observing that court may consider judicial efficiency in deciding whether to exercise discretionary jurisdiction).

---

[15]The Declaratory Judgment Act provides that a district court "*may* declare" the rights of interested parties. 28 U.S.C. § 2201(a) (emphasis added). We have held that the "may declare" language provides a district court with discretionary authority to hear and determine declaratory judgment cases. *United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 493 (4th Cir. 1998).

With these principles in mind, we first assess the contention that, because Stoller is neither a necessary nor an indispensable party to this action, the court erred in deciding that its non-party status was an adequate basis for dismissal of the declaratory judgment claims. Congress created the RCRA Provision so that a party injured by a bankrupt RCRA-regulated facility could proceed *directly* against those insurers providing financial assurance pursuant to RCRA, obviating the procedural complexities associated with pursuing an insured in bankruptcy proceedings. RCRA's statutory right of direct action would be eviscerated if, in situations where reliance on the RCRA Provision is authorized, such reliance is conditioned upon the bankrupt entity being a party to the proceeding. *See Searles v. Cincinnati Ins. Co.*, 998 F.2d 728, 730 (9th Cir. 1993) (observing that direct action is one in which plaintiff is entitled to bring suit against tortfeasor's liability insurer *without joining insured*). Thus, Stoller's absence as a party to this proceeding was, in itself, an inadequate basis for the dismissal of Counts Four and Five.

The appellants' contention that judicial economy was not an adequate basis for the dismissal of their declaratory judgment claims is another matter. In that regard, the appellants maintain that the court's concerns regarding judicial economy arose from its erroneous dismissal of Counts One through Three, and they contend that these concerns would be eliminated by the reinstatement of those Counts. Our resolution of this appeal with regard to Counts One through Three, however, undermines the appellants' position on this point.

Because the court's decision not to exercise jurisdiction over Counts Four and Five rested on the court's discretion and is supported by its concern about piecemeal litigation, we need not reach the issue of whether the RCRA Provision may be used to pursue a CERCLA declaratory judgment claim for present or prospective harm. Irrespective of whether the assertion of such a CERCLA claim is statutorily authorized, we are unable to say that the court abused its discretion. *White v. Nat'l Union Fire Ins. Co.*, 913 F.2d 165, 168 (4th Cir. 1990) (noting legitimacy of concern for judicial economy in assessing whether jurisdiction should be exercised in declaratory judgment proceeding). In these circumstances, the district court did not err in dismissing, without prejudice, Counts Four and Five.

IV.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*